[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 27 2001
THOMAS K. KAHN
CLERK

_____

No. 99-13138
_____

D. C. Docket No. 98-01794-CV-PT-M


MADE IN THE USA FOUNDATION,
UNITED STEELWORKERS OF AMERICA,
LOCAL 12L UNITED STEEL WORKERS, et al.,

                              Plaintiffs-Appellants,

     versus

UNITED STATES OF AMERICA,

                              Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Alabama
_____
**(February 27, 2001)**

Before TJOFLAT, WILSON and FLETCHER*, Circuit Judges.


_____
*Honorable Betty Binns Fletcher, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

FLETCHER, Circuit Judge:

This case presents complex issues of first impression in this circuit in the realm of constitutional interpretation — namely, whether certain kinds of international commercial agreements are "treaties," as that term is employed in Article II, Section 2 of the United States Constitution; and if so, whether the Treaty Clause represents the sole means of enacting such agreements into law. The appellants, comprised of national and local labor organizations as well as a nonprofit group that promotes the purchase of American-made products, urge that the North American Free Trade Agreement (commonly referred to as "NAFTA") be declared unconstitutionally void, as it was never approved by a two-thirds supermajority of the United States Senate pursuant to the constitutionally-mandated procedures governing treaty ratification. The Government, on the other hand, invokes the political question doctrine and also claims that this court lacks jurisdiction due to the appellants' lack of standing. In addition, the Government argues on the merits that NAFTA's enactment did not require Senate ratification as a "treaty." The parties' respective arguments thus require us to engage constitutional issues of unusual breadth, complexity and import.

In a remarkably learned and thorough opinion, the district court granted the Government's motion for summary judgment. <u>Made in the USA Foundation v.</u>

2

<u>United States</u>, 56 F.Supp.2d 1226 (N.D. Ala. 1999). The court found that Article III standing requirements had been met for most of the original appellants[1] and that the case did not present a nonjusticiable political question, thus electing to reach the merits of the case. Ultimately, however, the court held that even assuming NAFTA constitutes a full-fledged "treaty," the Treaty Clause does not constitute the exclusive means of enacting international commercial agreements, given Congress's plenary powers to regulate foreign commerce under Art. I, § 8, and the President's inherent authority under Article II to manage our nation's foreign affairs. Accordingly, the district court held that NAFTA's passage in 1993 by simple majorities of both houses of Congress was constitutionally sound.

We agree with the district court that the appellants have standing in this matter, and affirm the principle, as enunciated by the U.S. Supreme Court, that certain international agreements may well require Senate ratification as treaties through the constitutionally-mandated procedures of Art. II, § 2. <u>See, e.g.</u>, <u>Holden v. Joy</u>, 84 U.S. (17 Wall.) 211, 242-43, 21 L.Ed. 523 (1872); <u>Missouri v. Holland</u>,

---

[1] Included in the group of original appellants, in addition to the organizations mentioned, were a number of individuals whose standing to bring suit as voters was rejected by the district court. The appellants do not brief to us this aspect of the decision, relying on their belief that "the district court's holding that the organizational appellants have standing suffices to establish jurisdiction to proceed to the merits." <u>Appellants' Opening Brief</u> at 2 n.1. We therefore assume without deciding for purposes of this appeal that the claims of the individual appellants were properly dismissed by the district court.

3

252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 (1920).  We nonetheless decline to reach the merits of this particular case, finding that with respect to international commercial agreements such as NAFTA, the question of just what constitutes a "treaty" requiring Senate ratification presents a nonjusticiable political question.  Accordingly, we dismiss the appeal and remand with instructions to dismiss the action and vacate the decision of the district court.  See Goldwater v. Carter, 444 U.S. 996, 1005, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); United States v. Munsingwear, Inc., 340 U.S. 36, 39-40, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

I.     Introduction and Background

The United States, Mexico and Canada entered negotiations in 1990 to create a "free trade zone" on the North American continent through the phased elimination or reduction of both tariff and non-tariff barriers to trade.  Following extensive negotiations, the North American Free Trade Agreement was completed and signed by the leaders of the three countries on December 17, 1992.  Through the passage of the NAFTA Implementation Act ("Implementation Act") on December 8, 1993,[2] Congress approved NAFTA and provided for a series of

_____

[2] Pub.L. No. 103-182, 107 Stat. 2057 (1993), codified at 19 U.S.C. §§ 3301-3473.  The Implementation Act was passed by a vote of 234 to 200 in the House, and 61 to 38 in the Senate.  See 139 Cong. Rec. H10,048 (daily ed. Nov. 17, 1993); 139 Cong. Rec. S16,712-13 (daily ed. Nov. 20, 1993).

4

domestic laws to effectuate and enforce NAFTA's provisions.[3]

Neither NAFTA nor the Implementation Act were subjected to the ratification procedures outlined in the Treaty Clause.[4]  Summoning primarily historical arguments, the appellants contend that this failure to go through the Art. II, § 2 procedures contravenes the original understanding of the Framers and therefore renders NAFTA and the Implementation Act unconstitutional.  In support of their argument, the appellants marshal a considerable array of historical evidence.  Relying heavily on the research of the late Arthur Bestor, a Professor of History at the University of Washington, the appellants claim that records from the Constitutional Convention evidence a careful and conscious decision on the part of the Framers to require a two-thirds Senate majority for approving treaties, with the deliberate intention of preventing national majorities from binding minority interests under the Supremacy Clause to international accords against their wishes.[5]

---

[3] See 19 U.S.C. §§ 3311 et seq.

[4] Instead, President Clinton conducted the negotiations leading up to NAFTA under the so-called "fast-track" authority delegated to him by Congress in the Omnibus Trade and Competitiveness Act of 1988, codified at 19 U.S.C. §§ 2902-03.  Congress then approved NAFTA without amendment and passed implementing legislation pursuant to these same provisions, as well as those of the Trade Act of 1974, codified at 19 U.S.C. §§ 2191-94.

[5] The Government contests this historical account, noting that not all commentators agree with Bestor's conclusions regarding the adoption of the Treaty Clause.  Perhaps most prominently, Professors Myres McDougal and Asher Lans, two of the early advocates of the congressional-executive agreement as an alternative to the Treaty Clause, contend that "three salient facts emerge" from what we know of the Framers' discussions regarding the

5

Furthermore, the appellants point to several early examples in our Nation's history (such as the Jay Treaty debate)[6] when the United States entered into major commercial agreements with other countries, each of which was ratified as a treaty and approved by a two-thirds supermajority of the Senate.[7]

Based on the near-contemporaneous writings of Emmerich de Vattel,[8] the

constitutional framework for the governance of foreign affairs: (1) the Framers paid relatively little attention to the matter; (2) as a general rule, "the delegates . . . sought to remove the determination of foreign policy at least in the immediate future as far as possible from popular control"; and (3) the language used by the Framers "clearly permits utilization of other methods than that provided in the treaty clause for securing validation of international agreements . . . ." Myres S. McDougal and Asher Lans, II Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy, 54 Yale L.J. 534, 536-37 (1945) (hereinafter "McDougal and Lans II").

[6] See 5 Annals of Cong. 760-62 (1796) (reprinting President Washington's message denying that the House had any role in deciding whether to implement treaties approved by the Senate and ratified by the President). Under James Madison's leadership, the House responded by adopting a resolution disclaiming "any agency in making Treaties," but also insisting that "when a Treaty stipulates regulations on any of the subjects submitted by the Constitution to the power of Congress, it must depend, for its execution, as to such stipulations, on a law or laws to be passed by Congress." Id. at 771-72. Implementing legislation for the Jay Treaty eventually passed in the House by a vote of 57 to 35. Id. at 782-83.

[7] See Bruce Ackerman and David Golove, Is NAFTA Constitutional?, 108 Harv. L. Rev. 799, 810-12 (1995) (hereinafter "Ackerman and Golove"); David M. Golove, Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power, 98 Mich. L. Rev. 1075, 1157-93 (2000).

[8] The Supreme Court discussed Vattel's influence in United States Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978), with respect to the constitutional definitions of the terms "treaty," "alliance," "compact," and "agreement":

Some commentators have theorized that the Framers understood those terms in relation to the precisely defined categories, fashionable in the contemporary literature of international law, of accords between sovereigns. . . . The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel. . . .

appellants contend that the key distinction in the minds of the Framers in determining whether a given agreement required ratification as a treaty turned on the relative importance of the accord; significant agreements were to be deemed treaties, while less important ones were to be considered compacts or executive agreements.[9] Thus, according to the appellants, an accord such as NAFTA, with its wide-ranging scope and impact — including the harmonization of financial, commercial, labor, and environmental laws and regulations and the establishment of supranational adjudicatory bodies to settle disputes between the signatories — surely falls into the class of agreements which require ratification as a treaty. The appellants' position can best be summarized as follows:

---

Vattel differentiated between "treaties," which were made either for perpetuity or for a considerable period, and "agreements, conventions, and pactions," which "are perfected in their execution once for all." E. Vattel, Law of Nations 192 (J. Chitty ed. 1883). Unlike a "treaty" or "alliance," an "agreement" or "paction" was perfected upon execution: "[T]hose compacts, which are accomplished once for all, and not by successive acts,--are no sooner executed then they are completed and perfected. If they are valid, they have in their own nature a perpetual and irrevocable effect . . . ." Id. at 208. This distinction between supposedly ongoing accords, such as military alliances, and instantaneously executed, though perpetually effective agreements, such as boundary settlements, may have informed the drafting in Art. I, § 10.

434 U.S. at 462 n.12, 98 S.Ct. 799 (citations omitted).

[9] The Government disputes this characterization, arguing that the distinctions made by Vattel were based on whether or not the agreement was to have long-term effects, as well as the degree of permanence that the agreement carried with it. The Government also notes that some scholars analyzing Vattel's work have concluded that the author considered the terms "convention," "agreement," and "arrangement" to represent forms of the general category called "treaties." See, e.g., David M. Golove, Against Free-Form Formalism, 73 N.Y.U. L. Rev. 1791, 1910 n.361 (1998).

Once it is recognized, as it must be, that the Treaty Clause requires a Senate supermajority for at least *some* agreements affecting commerce, [then] the outcome of this case is clear.  NAFTA is an agreement of extraordinary scope and impact.  It has profound ramifications not only for regional economic interests but for the ability of state and local governments, as well as the federal government, to enforce their laws and regulations.  And it binds the three signatories to the economic equivalence of a military alliance.  Whether wise or unwise, such steps cannot, under our Constitution, be taken without the concurrence of two-thirds of the Senate.

Appellants' Opening Brief at 21.  Congressional adoption of NAFTA in 1995 via simple majorities in both Houses, pursuant to the procedures reserved for ordinary legislation, contravened this important, built-in constitutional protection for minority interests.

Remarkably, although perhaps not altogether surprisingly, the United States Supreme Court has never in our nation's history seen fit to address the question of what exactly constitutes and distinguishes "treaties," as that term is used in Art. II, § 2, from "alliances," "confederations," "compacts," or "agreements," as those terms are employed in Art. I, § 10.[10]  Accordingly, the Court has never decided

---

[10] Significantly, the Supreme Court has acknowledged that a determination of what the Framers actually meant when they used the word "treaty" is difficult in light of the fact that "[w]hatever distinct meanings the Framers attributed to the terms [treaty, alliance, confederation, agreement and compact in the Constitution]", "those meanings were soon lost." United States Steel, 434 U.S. at 463, 98 S.Ct. 799.  See also Laurence H. Tribe, Taking Text and Structure Seriously; Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L. Rev. 1221 (1995) (hereinafter "Tribe") ("What the Founders saw as the precise definitions of treaties, alliances, confederations, agreements, and compacts is largely lost to us now.  Consequently, line-drawing in this area is especially complex.") (footnote omitted).

what sorts of international agreements, if any, might require Senate ratification pursuant to the procedures outlined in Art. II, § 2. Indeed, as will be discussed below, the only extended pronouncement of the Court's Treaty Clause jurisprudence can be found in <u>Goldwater v. Carter</u> — a case in which the Court effectively refused to require President Carter to submit the abrogation of a mutual defense treaty with Taiwan for Senate ratification, but failed to garner a majority of the Court behind a single rationale.[11] In light of the Constitution's silence on the meaning of the word "treaty," as well as the relative dearth of Supreme Court jurisprudence in this area, the question of NAFTA's constitutionality has generated significant debate amongst prominent legal scholars.[12]

---

[11] We note in this regard that although the Cases-and-Controversies Clause of Art. III, § 2, states that "the judicial power shall extend to all cases . . . arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority . . . ," this passage does not speak to whether the court's jurisdiction extends to challenges to the treaty-making procedures employed by Congress and the President. Nor does this passage preclude the Government's argument that the appellants lack standing or that this case presents a nonjusticiable political question.

[12] <u>See, e.g.</u>, Ackerman and Golove, <u>supra</u>; Tribe, <u>supra</u>. Prior to the debate over NAFTA, the constitutional status of congressional-executive agreements was already the subject of considerable commentary by a number of legal scholars. <u>See, e.g.</u>, Louis Henkin, <u>Foreign Affairs and the Constitution</u> 175-76 (1975) ("[T]he constitutionality of the Congressional-Executive agreement is established, [and] is used regularly at least for trade and postal agreements."); Harold Hongju Koh, <u>Congressional Controls on Presidential Trade Policymaking After</u> "I.N.S. v. Chadha", 18 N.Y.U. J. Int'l L. 1191, 1195 n.13 (1986) ("Treaties and congressional-executive agreements are now generally treated as interchangeable instruments of U.S. foreign policy."); John H. Jackson, <u>The General Agreement on Tariffs and Trade in United States Domestic Law</u>, 66 Mich. L. Rev. 250, 253 (1967) ("It is generally settled that under our Constitution international 'treaty' obligations can be established . . . [by] an executive agreement of the President, acting under authority delegated by an act of Congress . . .

We begin, as we must, with the Government's challenges to this court's jurisdiction. Assuming that Article III requirements have been met, we would have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment de novo. Real Estate Fin. v. Resolution Trust Corp., 950 F.2d 1540, 1543 (11th Cir. 1992) (per curiam).

*II    Standing*

Article III's standing requirements are rooted in one of the hallmarks of our nation's system of governance: the constitutional separation of powers. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818, 117 S.Ct. 2312, 2317,

---

."); McDougal and Lans I, at 187 ("[P]ractice under the Constitution . . . has confirmed beyond doubt . . . that the treaty-making power is no barrier to Congressional authorization or sanction of agreements."). See also Restatement (Third) of the Foreign Relations Law of the United States § 303 note 8 (1986) ("Congressional-Executive agreements have in fact been made on a wide variety of subjects, and no such agreement has ever been effectively challenged as improperly concluded.").

Not all commentators have agreed with the Government's position. See Tribe, supra, at 1221 (concluding that the judiciary has the authority to decide that the political branches have violated constitutionally-mandated procedures with respect to certain international agreements, and arguing that "the American people . . . are . . . entitled to the safeguards provided by the Senate supermajority requirement of the Treaty Clause"); Edwin Borchard, Shall the Executive Agreement Replace the Treaty?, 53 Yale L.J. 664 (1944); Edwin Borchard, Treaties and Executive Agreements--A Reply, 54 Yale L.J. 616 (1945) (offering a direct response to the arguments presented by McDougal and Lans).

10

138 L.Ed.2d 849 (1997) (quoting Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). As the Court stated in Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), "the case or controversy requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."

In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Court defined standing analysis as involving the assessment of three separate but interrelated criteria:

First, the appellant must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural' or 'hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

The district court found — and the government does not really contest — that the appellants' pleadings meet the injury-in-fact and causation requirements.[13] Instead,

---

[13] Significantly, the Government's challenge to the appellants' standing was raised at the pleading stage, in the context of a motion to dismiss. As the Court stated in Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Given the appellants' plausible allegations that their injuries have been caused at least in part by changed trade and investment patterns generated by NAFTA, we therefore may not disturb the

11

the Government principally argues that the appellants' claims fail to demonstrate that their alleged injuries are redressable by this court. Stated otherwise, the Government contends that the relief sought by the appellants is so attenuated from the injuries they have alleged as to constitute mere speculation. Specifically, the appellants requested declaratory, mandatory and injunctive relief in the form of two orders from the district court: first, a declaration that NAFTA had not been approved in a constitutional manner and therefore is "null, void and of no effect"; and second, an order directing the President to notify the governments of Mexico and Canada that the United States would be terminating its participation in NAFTA within thirty days. According to the Government, even if granted, such relief would not be likely to redress the appellants' alleged injuries, because it rests upon the speculative assumption that Mexico or Canada would subsequently change their trade policies or that U.S. companies would be induced to return to (or remain

---

district court's holding "unless it appears beyond doubt that the appellant[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also Smith v. Meese, 821 F.2d 1484, 1495-96 (11th Cir. 1987) (applying the Conley standard). To be sure, "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Whitmore v. Arkansas, 495 U.S. 149, 160, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). Nonetheless, for purposes of this appeal, we must presume that the appellants' general allegations of past and ongoing injury due to NAFTA's enactment — in the form, inter alia, of lost jobs, reduced wages and bargaining power, as well as diminished capacity to buy American-made products — satisfy the "relatively modest requirements that apply at this stage of the litigation." Bennett v. Spear, 520 U.S. 154, 171 (1997).

in) the United States.

However, the appellants have amassed considerable evidence, much of it from government sources, from which we may infer that U.S. reimposition of tariff and non-tariff barriers to trade is by itself likely to result in somewhat reduced competition from foreign imports, thereby generating more demand for domestic production -- and therefore more jobs, higher wages, and increased bargaining power — in the industries represented by the appellant labor organizations.[15] Furthermore, irrespective of the broader economic wisdom of such measures, a return to the pre-NAFTA regime would likely result in the greater availability of U.S.-made products for purchase by U.S. consumers, at least in the markets benefiting from renewed trade protection.[16] We therefore find that by virtue of

---

[15] See, e.g., President Clinton, Study on the Operation and Effect of the North American Free Trade Agreement 19, 21-22 (1997) (providing a sectoral analysis of NAFTA's effects and acknowledging that while studies on the net employment effects of NAFTA are inconclusive, "[c]learly, some imports may have a job-displacement effect," and thousands of workers have applied for the NAFTA Transitional Adjustment Assistance program); Statement of Administrative Action, H.R. Doc. No. 103-159, Vol. I at 969-70, 978 (1993) (recognizing that "as a result of the NAFTA, some workers may lose their jobs permanently"); United States Int'l Trade Comm'n, The Year in Trade: Operation of the Trade Agreements Program During 1998 at 33-34 (May 1999) (discussing the growth in the U.S. trade deficit as a result of NAFTA); United States Int'l Trade Comm'n, Investigation No. 332-381: The Impact of the North American Free Trade Agreement on the U.S. Economy and Industries: A Three-Year Review 7-8 (July 1997) (stating that "7 industries showed employment effects that are adversely sensitive to lower prices for imports from Mexico," and noting specifically that NAFTA has probably led to reduced domestic production and manufacturing job losses in the apparel, textiles, and women's footwear industries).

[16] See id.

13

NAFTA's effect on domestic law alone, relief in this case does not largely "depend on the unfettered choices made by independent actors not before the courts." ASARCO Inc. v. Kadish, 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989).

The Government contends that three cases from the D.C. Circuit support its position: Talenti v. Clinton, 102 F.3d 573 (D.C. Cir. 1996),[17] Dellums v. U.S. Nuclear Regulatory Comm'n, 863 F.2d 968 (D.C. Cir. 1988),[18] and Greater Tampa

---

[17] In Talenti, a naturalized American citizen of Italian descent whose property had allegedly been expropriated by the Italian government sought to compel the President, the Secretary of State, and the Acting Director of the International Cooperation Agency to withhold federal aid to Italy under the Hickenlooper Amendment to the Foreign Assistance Act. The D.C. Circuit denied the claim on the grounds that Talenti relied on a series of highly dubious contingencies, including the unlikely prospect that the President would decline to exercise his statutory authority to waive the withholding of aid to a NATO ally "in the national interest." Talenti, 102 F.3d at 577. It is clear that Talenti involved a sequence of events so remote as to defy common sense, not to mention legal requirements. By contrast, in this case, it is evident that even apart from any reactions on the part of the Mexican and Canadian governments, changes in domestic laws resulting from NAFTA's invalidation are substantially likely to ameliorate some, if not all, of the appellants' injuries.

[18] In Dellums, the D.C. Circuit rejected the claim of an unemployed uranium miner in New Mexico, who challenged the Nuclear Regulatory Commission's decision to grant a license to import uranium from South Africa. Recognizing that the miner's inability to find employment constituted injury in fact, the court nonetheless found that even if the Commission were to ban the importation of South African uranium into the United States and the appellant could show that such a ban would benefit the domestic uranium mining industry as a whole, such a showing would still fall short of demonstrating that he personally would benefit from this result. Dellums, 863 F.2d at 974. Accordingly, the court held that the appellant lacked standing. Here, by contrast, not only are individual members likely to benefit, but the institutional appellants are likely to benefit as organizations from the restoration of the pre-NAFTA trade and investment regime.

14

Chamber of Commerce v. Goldschmidt, 627 F.2d 258 (D.C. Cir. 1980).[19]  We find

these cases, however, to be readily distinguishable.  Unlike these cases, here there

exists a clearly established record of pre- and post-NAFTA trade and investment

activity on the part of the United States, Mexico and Canada, which also bears on

their probable behavior in the event of a U.S. withdrawal from NAFTA.[20]  We

therefore reject the Government's version of the likely Canadian and Mexican

reaction to a U.S. withdrawal as being far more unfounded and speculative than the

appellants' predictions.  As the Supreme Court stated in Duke Power Co. v.

Carolina Environmental Study Group, 438 U.S. 59, 78, 98 S.Ct. 2620, 57 L.Ed.2d

---

[19] In Goldschmidt, the appellants challenged the validity of an executive agreement regulating air travel between the United States and the United Kingdom, claiming that the agreement was invalid because it was a treaty that should have been submitted for Senate approval.  The D.C. Circuit found that even if it did declare the agreement invalid, the appellants had failed to establish that (1) the Senate would not ratify the agreement anyway, or (2) the United Kingdom would react by changing its position to one more favorable to the appellants' interests, and that therefore the remedy was not substantially likely to redress the appellants' injuries.  Significantly, the Goldschmidt appellants themselves acknowledged that the United Kingdom would probably not agree to any modification of the flight limits that had been agreed to in the executive agreement in question. Goldschmidt, 627 F.2d at 263.  By contrast, relief for the appellants in this case does not depend on the actions of a single governmental actor.  In some respects, then, the fact that myriad actors (both public and private) are likely to be affected by the withdrawal of the United States from NAFTA and to respond to the resulting changes in economic incentives militates strongly in favor of the conclusion that on balance, at least some of the injuries suffered by the organizations who brought suit in this case are likely to be redressed by the relief sought.

[20] See sources cited at n.15, supra.  Indeed, it is precisely those parties involved in NAFTA's approval and implementation who have claimed that the significant changes in our nation's economic relations with Mexico and Canada would not have come about but for its passage.

595 (1978), "Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief."

Perhaps most importantly, implicit in the Government's argument is the core contention that this court lacks the requisite authority to order the President to notify Mexico and Canada of this nation's withdrawal from NAFTA.[21] According to this view, the President, in signing NAFTA, caused the agreement to become binding on the United States under international law, and only he has the authority to abrogate such an international obligation.[22] Hence, absent judicial authority to

---

[21] Although the Government does not raise this issue, we note that sovereign immunity does not act as a bar to our exercising jurisdiction over this case. To be sure, the statute most often cited as the source of the federal government's waiver of sovereign immunity in cases not involving money damages — the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. — cannot serve that purpose here, given that only the President may terminate our country's participation in NAFTA. As a majority of the Court found in Franklin v. Massachusetts, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the President is not an "agency" within the meaning of the APA, and his actions are therefore not subject to review under the statute. Id. at 800-01. However, "the President's actions may still be reviewed for constitutionality," id. at 801 (citations omitted); furthermore, we note that the so-called Larson-Dugan exception permits suits to go forward alleging that a government's official's actions were unconstitutional or beyond statutory authority, on the grounds that such actions "are considered individual and not sovereign actions." Larson v. Domestic & Foreign Comm. Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); see also Dugan v. Rank, 372 U.S. 609, 621-23, 83 S.Ct. 999, 1006-08, 10 L.Ed.2d 15 (1963). Thus, like the district court, we are satisfied that the appellants are not barred by sovereign immunity from pursuing their claims. See also Swan v. Clinton, 100 F.3d 973, 981 (D.C. Cir. 1996).

[22] See Curtiss-Wright, 299 U.S. at 319, 57 S.Ct. 216 ("[T]he President alone has the power to speak or listen as a representative of the Nation. He makes treaties with the advice and consent of the Senate; but he alone negotiates."); Restatement (Third) § 339(c) (stating that only the President has the authority and discretion to bind the United States under international law).

compel the President to withdraw from NAFTA, it is unlikely that the appellants'

injuries would be redressed by a favorable ruling from this court.  We reject this

argument for standing purposes, however, relying chiefly on the reasoning

employed in the plurality portion of the Court's opinion in Franklin v.

Massachusetts, 505 U.S. 788, 802-03, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992),

and applied most recently by the D.C. Circuit in Swan v. Clinton, 100 F.3d 973,

976-77 (D.C. Cir. 1996).

Franklin involved a challenge to the methodology by which overseas federal

employees were allocated to different states in the 1990 census, which in turn

affected how seats in the House of Representatives would be reapportioned.[23]  The

appellants in Franklin sued both the Secretary of Commerce and the President

under the APA, seeking injunctive and declaratory relief for what they claimed was

an "arbitrary and capricious" decision to allocate overseas military personnel to

individual states based on the "home of record" designated in their personnel files.

This policy change resulted in the loss of one House seat from the state of

Massachusetts.

A majority of the Franklin Court first held that the President is not an

---

[23] Under the relevant statute, the Secretary of Commerce is required to perform the census and report the data to the president, who in turn is required within nine months to transmit a statement to Congress indicating the number of Representatives to which each state is entitled based on the census data.

"agency" within the meaning of the APA, and that his actions are therefore not subject to judicial review under the APA's provisions. Id. at 800-01. More importantly for our purposes, in a part of the Court's opinion joined only by four Justices, the Franklin Court addressed the "thorn[y] standing question [of] whether the injury is redressable by the relief sought." Id. at 802. After noting the difficult separation-of-powers issues raised by any judicial order purporting to direct injunctive relief against the President himself, the Franklin plurality concluded that "[f]or purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone." Id. at 803. Moreover, "we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." Id.[24]

---

[24] Citing Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501, 18 L.Ed. 437 (1866), the Franklin plurality expressly noted that "[w]e have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." Franklin, 505 U.S. at 802, 112 S.Ct. 2767. However, in signing NAFTA, the President arguably created a binding international obligation, such that even if this court were to declare NAFTA unconstitutional for purposes of domestic law, these international obligations would remain. See Restatement (Third) §§ 302-303; Vienna Convention on the Law of Treaties, arts. 26 and 46; Pigeon River Improvement, Slide and Boom Co. v. Charles W. Cox, Ltd., 291 U.S.

18

Although a majority of the Court failed to sign on to this portion of the Franklin opinion, we note that the D.C. Circuit drew heavily from this approach in Swan. There, a former member of the Board of the National Credit Union Administration ("NCUA") sued President Clinton and other Executive Branch officials, seeking to have his removal from the NCUA Board declared unlawful. While noting that "[i]n most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials," the Swan court remarked that this may "represent[] one of those rare instances where . . . only injunctive relief against the President himself will redress Swan's injury, because only the President has the power to remove or reinstate NCUA Board members." Id. at 976-78. The court nonetheless concluded that it could order NCUA staff members to treat Swan as a "de facto" Board member and that this partial remedy would be sufficient for redressability, in spite of the fact that "the President has the power, if he so chose, to undercut [this] relief." Id. at 980-81. In so holding, the

138, 160, 54 S.Ct. 361, 78 L.Ed. 695 (1934) (acknowledging that although a subsequent act of Congress that conflicted with a provision in a treaty "would control in our courts as the later expression of our [domestic] law . . . the international obligation [would] remain [ ] unaffected"). We therefore agree with the Government that a decision involving the nation's withdrawal from an international obligation clearly entails a large measure of discretion and therefore cannot be considered purely ministerial.

court "recogniz[ed] that such partial relief is sufficient for standing purposes when determining whether we can order more complete relief would require us to delve into complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch." Id.

We find this reasoning to be persuasive. To be sure, the line of cases cited in Swan, including Franklin and Mississippi v. Johnson, casts serious doubt as to whether courts have the power to direct or enjoin the President in the performance of his official duties.[25] Nonetheless, the Government simply cannot deny the fact that there are numerous subordinate executive officials engaged in the continued operation and enforcement of NAFTA's provisions.[26] Hence, we believe that even

---

[25] We are well aware of the Franklin Court's declaration that a judicial "grant of injunctive relief against the President himself is extraordinary," 505 U.S. at 802, and that "in general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." Id. at 803 (quoting Mississippi v. Johnson, 71 U.S. at 501). Although only a plurality of four Justices joined this part of the Court's opinion, it is clear from Justice Scalia's concurrence that he would agree with this particular proposition. See Franklin, 505 U.S. at 829 (Scalia, J., concurring) ("Unless the other branches are to be entirely subordinated to the Judiciary, we cannot direct the President to take a specified executive act or the Congress to perform particular legislative duties.").

[26] As the district court noted, the appellants' complaint failed to identify subordinate officials who could be enjoined, as well as specific provisions of the Implementation Act or regulations that such officials should cease to implement in order to redress their injuries. However, the lack of specificity in the appellants' request for relief does not preclude a finding of redressability. The Supreme Court has held that a court has power under the All Writs Act, 28 U.S.C. § 1651(a), to issue commands that apply to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." United States v. New York Tel. Co., 434 U.S. 159, 172-74, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); see also Swan, 100 F.3d at 979-80.

20

short of directly ordering the President to terminate our nation's participation in NAFTA, a judicial order instructing subordinate executive officials to cease their compliance with its provisions would suffice for standing purposes.

In sum, we conclude that the appellants have sufficiently alleged injuries that are fairly traceable to NAFTA, and that there is a substantial likelihood that their injuries would be redressed by a favorable decision from this court. Despite being unable to predict with certainty what all of the ramifications of an order declaring NAFTA unconstitutional might be, we agree with the district court that while "[s]ome previously accrued injuries may not be redressable . . . that is not to say that future injuries may not be avoided," and that this is enough to establish that "it is substantially likely that at least some of the institutional plaintiffs' alleged injuries will be redressed." 56 F.Supp.2d at 1253-54.[27]

## III. *Political Question*

---

[27] The Government also contends that the appellants' claims are not redressable because even if they did obtain a judgment declaring NAFTA itself to be unconstitutional, such a ruling would have no effect on the validity of the Implementation Act, which was passed by Congress as ordinary legislation. We reject this artful distinction as a red herring. As the district court noted, "It is obvious that the Agreement and the Implementation Act were designed to be and intended to be applied in tandem." 56 F.Supp.2d at 1253. Were this court to declare NAFTA unconstitutional, its self-executing provisions would be invalidated. Furthermore, a number of the Implementation Act's provisions would, by their own terms, be rendered inoperative — including its threshold provision, which would cause the remainder of the implementing legislation to become void under basic principles of severability. See 19 U.S.C. §§ 3311, 3331; Scheinberg v. Smith, 659 F.2d 476, 480-81 (5th Cir. 1981).

21

We now turn to the Government's second jurisdictional argument. According to the Government, because the text of the Constitution fails to define what is meant by a "treaty" or to dictate the proper procedure for approving international commercial agreements, and because the Constitution has clearly granted the political branches an enormous amount of authority in the areas of foreign affairs and commerce, the choice of what procedure to use for a given agreement is committed to the discretion and expertise of the Legislative and Executive Branches by virtue of the political question doctrine. We substantially agree with the Government's contentions that this case does not present the type of question that can be properly addressed by the judiciary, given our belief that Supreme Court precedent and historical practice[28] confirm the wisdom of maintaining the practice of judicial nonintervention into such matters. Drawing

_____

[28] Although the appellants argue that historical practice is irrelevant to political question analysis, we believe that history may inform the inquiry inasmuch as it fleshes out the manner in which the executive and legislative branches have sought to exercise and accommodate their textually committed foreign affairs powers over time. Furthermore, historical practice may illuminate any prudential considerations governing the advisability or inadvisability of judicial intervention in a given controversy. See Ackerman and Golove, supra, at 925 ("From Bretton Woods to the WTO, many of America's key commitments have taken the form of congressional-executive agreements.") Hence, we are mindful of Justice Frankfurter's wise concurrence in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952): "Deeply imbedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of text or supply them. It is an inadmissibly narrow conception of American constitutional law to confine it to words of the Constitution and to disregard the gloss which life has written upon them." Youngstown, 343 U.S. at 610-11, 72 S.Ct. 863 (Frankfurter, J., concurring).

22

heavily from (then Associate) Justice Rehnquist's plurality opinion in <u>Goldwater v. Carter</u>, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) — as noted earlier, the only extended exposition of the Supreme Court's Treaty Clause jurisprudence — we conclude that this case presents a nonjusticiable political question.

The political question doctrine emerges out of Article III's case or controversy requirement and has its roots in separation of powers concerns. <u>Baker v. Carr</u>, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In <u>Baker</u>, the Supreme Court enumerated six criteria that courts should consider in determining whether a case is nonjusticiable:

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. 691. Significantly, any one of the above-listed characteristics may be sufficient to preclude judicial review. <u>Id.</u>

In <u>Goldwater</u>, Justice Powell's concurrence suggested that the <u>Baker</u> analysis could be condensed into a three-question inquiry:

(i) Does the issue involve resolution of questions committed by the text of the

Constitution to a coordinate branch of government?
(ii) Would resolution of the question demand that a court move beyond areas of judicial expertise?
(iii) Do prudential considerations counsel against judicial intervention?

444 U.S. at 998, 100 S.Ct. at 533. Inasmuch as it incorporates the Baker criteria without abridging them, we find Justice Powell's analytical framework to be useful and proceed to apply each of these inquiries to the present case.

*A.      Constitutional Textual Commitment to Coordinate Branches*

The term "treaties" appears four times in the text of the Constitution. The Treaty Clause, U.S. Const. Art. II, § 2, cl. 2, states that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two-thirds of the Senators present concur." The Compacts Clause, U.S. Const. Art. I, § 10, cl. 3, delineates the power of the states to deal with foreign powers, completely prohibiting the states from making "treaties" with foreign nations, but permitting states to enter into "agreements or compacts" with foreign powers with the consent of Congress. The Cases-and-Controversies Clause, U.S. Const. Art. III, § 2, states, in pertinent part, that "the judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made . . . ." And finally, the Supremacy Clause, U.S. Const. Art. Art. VI, cl. 2, states that "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be

24

made, under the authority of the United States, shall be the supreme law of the land." However, as noted earlier, the text of the Constitution does not (1) define the term "treaties"; (2) delineate the difference between treaties and other types of international agreements; (3) mandate that treaties are the exclusive means by which the federal government may make agreements with foreign powers; or (4) state that the Treaty Clause procedure is the only manner in which a treaty may be enacted. See also Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 569, 10 L.Ed. 579 (1840) (acknowledging that the Treaty Clause is worded in "general terms, without any description of the objects intended to be embraced by it").

The Constitution confers a vast amount of power upon the political branches of the federal government in the area of foreign policy — particularly foreign commerce. The breadth of the President's inherent powers in foreign affairs arises from his role as Chief Executive, U.S. Const. Art. II, § 1, cl. 1, and as Commander in Chief, U.S. Const. Art. III, § 2, cl. 1. In addition to his power to "make Treaties" with the advice and consent of two-thirds of the Senators present, the President's authority in foreign affairs is further bolstered by his power to "appoint Ambassadors . . . and Consuls," U.S. Const. Art. II, § 2, cl. 2, and "to receive Ambassadors and other public Ministers," U.S. Const. Art. II, § 3. Meanwhile, Congress's enumerated powers in the realm of external affairs include its power "to

25

declare war," U.S. Const., Art. I, § 8, cl. 11; "to raise and support armies," U.S. Const., Art. I, § 8, cl. 12; "to provide and maintain a navy," U.S. Const., Art. I, § 8, cl. 13; and the Senate's advice-and-consent role in the treaty-making process. Most significantly, the Constitution also confers on the entire Congress (and not just the Senate) authority "to regulate commerce with foreign nations," U.S. Const. Art. I, § 8, cl. 3 — an express textual commitment that is directly relevant to international commercial agreements such as NAFTA.[29]

The Supreme Court has repeatedly recognized that the President is the nation's "guiding organ in the conduct of our foreign affairs," in whom the Constitution vests "vast powers in relation to the outside world." Ludecke v. Watkins, 335 U.S. 160, 173, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948); see also Department of Navy v. Egan, 484 U.S. 518, 529, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("recogniz[ing] 'the generally accepted view that foreign policy [i]s the province and responsibility of the Executive'" (citation omitted)). With respect to NAFTA, it is especially important to note that the Supreme Court has long since recognized the power of the political branches to conclude international "agreements that do not constitute treaties in the constitutional sense."

---

[29] Other relevant enumerations of power include Congress's authority to levy and collect taxes, duties, imposts and excises, U.S. Const. Art. I, § 8, cl. 1.

Curtiss-Wright, 299 U.S. at 318, 57 S.Ct. 216.

These cases interpreting the broad textual grants of authority to the President and Congress in the areas of foreign affairs leave only a narrowly circumscribed role for the Judiciary. As the Supreme Court stated in Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918), "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative--'the political'--departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." See also Crosby v. Nat'l Foreign Trade Council, __ U.S. __, 120 S.Ct. 2288, 2301, 147 L.Ed.2d 352 (2000) (acknowledging that "the 'nuances' of 'the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court'") (quoting Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 196, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983)). Within this circuit, we have declared that "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.' " Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997) (quoting Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640

27

(1981)).[30]

To be sure, the Baker Court deemed it "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Baker, 369 U.S. at 211, 82 S.Ct. 691.  Furthermore, the Court has recognized that "foreign commitments" cannot relieve the government of the obligation to "operate within the bounds laid down by the Constitution," and that "the prohibitions of the Constitution . . . cannot be nullified by the Executive or by the Executive and Senate combined."  Reid v. Covert, 354 U.S. 1, 14, 17, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).  We therefore have little doubt that courts have the authority -- indeed, the duty -- to invalidate international agreements which violate the express terms of the Constitution.  Nonetheless, with respect to commercial agreements, we find that the Constitution's clear assignment of authority to the political branches of the Government over our nation's foreign affairs and commerce counsels against an intrusive role for this court in overseeing the actions of the President and Congress in this matter.

The appellants concede, as they must, that the Constitution affords the political branches substantial authority over foreign affairs and commerce.  The

---

[30] See also Antolok v. United States, 873 F.2d 369 (D.C. Cir. 1989) ("nowhere does the Constitution contemplate the participation by the third, non-political branch, that is the Judiciary, in any fashion in the making of international agreements").

appellants also concede that the Supreme Court has recognized the constitutional validity of the longstanding practice of enacting international agreements which do not amount to full-fledged treaties.[31] See Curtiss-Wright, 299 U.S. at 318, 57 S.Ct. 216; see also Ackerman and Golove, supra, at 858; Tribe, supra, at 1269 ("The authority to make international agreements that do not rise to the level of treaties has long been recognized as [an] inherent executive power [of the President]."). Nonetheless, the appellants argue that what is at issue here is not the authority of a branch of government over a certain subject matter, but whether that branch "has chosen a constitutionally permissible means of implementing that power." I.N.S. v. Chadha, 462 U.S. 919, 940-41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). This contention leads us to the second Goldwater/Baker inquiry: whether the resolution of this issue would require this court to move beyond recognized areas of judicial expertise.

*B. Judicial Expertise*

Under Baker, the second criterion by which we evaluate the justiciability of this case is whether or not there exist judicially manageable standards for determining when a given international commercial agreement must be approved

---

[31] Significantly, the Court has also noted that "Congress has not been consistent in distinguishing between Art. II treaties and other forms of international agreements." Weinberger v. Rossi, 456 U.S. 25, 30, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982).

pursuant to the Art. II, § 2 procedures. Baker, 369 U.S. at 217, 82 S.Ct. 691. The Government contends that such a decision would require this court to consider areas beyond its judicial expertise. We agree.

As noted earlier, in Goldwater v. Carter, members of Congress challenged the President's unilateral termination of a mutual defense treaty with Taiwan (formerly known as the Republic of China). As in the present case, the crux of the challenge centered on the allegedly unconstitutional procedures used to abrogate the treaty, and not on the treaty's substantive provisions. A plurality of the Court determined that the case was nonjusticiable because the text of the Constitution failed to provide any guidance on the issue; joined by three other members of the Court, Justice Rehnquist noted that "while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to the body's participation in the abrogation of a treaty." Id. at 1003, 100 S.Ct. 533.[31] Justice Rehnquist thus concluded that "in light of the absence of any constitutional provision governing the termination of a treaty, and the fact that

---

[31] Justices Powell and Brennan expressly disagreed with the conclusion that the case involved a nonjusticiable political question. Goldwater, 444 U.S. at 998. Justices Blackmun and White would have set the case for oral argument and plenary consideration, deeming it "indefensible, without further study, to pass on the issue of justiciability or on the issues of standing or ripeness." Goldwater, 444 U.S. at 1006. The ninth justice, Justice Marshall, simply concurred in the result of the case, leaving no indication as to his position on the political question issue.

different termination procedures may be appropriate for different treaties . . . the instant case . . . must surely be controlled by political standards" rather than by judicial standards. Id. (internal quotations omitted).

While the nature of the issue presented in Goldwater differs somewhat from the present case, we nonetheless find the disposition in Goldwater instructive, if not controlling, for our purposes, in that the Supreme Court declined to act because the constitutional provision at issue does not provide an identifiable textual limit on the authority granted by the Constitution.[32] Indeed, just as the Treaty Clause fails to outline the Senate's role in the abrogation of treaties, we find that the Treaty Clause also fails to outline the circumstances, if any, under which its procedures must be adhered to when approving international commercial agreements.

Significantly, the appellants themselves fail to offer, either in their briefs or at argument, a workable definition of what constitutes a "treaty." Indeed, the appellants decline to supply any analytical framework whatsoever by which courts can distinguish international agreements which require Senate ratification from those that do not. Rather, the appellants offer up the nebulous argument that

---

[32] See also Nixon v. United States, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (holding that because the Constitution does not place any limits on the Legislative Branch's discretion in dictating the procedures surrounding impeachment proceedings, a former federal judge's claim that the rules and procedures used by the Senate in trying impeachments were improper was not justiciable).

31

"major and significant" agreements require Art. II, § 2 ratification, without defining how courts should go about making such distinctions.[33] According to the appellants, it is neither possible nor necessary to define the meaning of a "treaty" to decide this case, so long as we find that if any commercial agreement qualifies as a treaty requiring Senate ratification, NAFTA surely does. We disagree, given that under Baker and Goldwater, the ascertainment of judicially manageable standards is essential before we may rule that this court even has jurisdiction to reach the merits of the case.

The appellants contend that this case does not push the court into areas beyond the limits of judicial expertise, inasmuch as it does not involve a ruling on the policy merits of NAFTA, but only a determination as to the constitutionality of

---

[33] Alternatively, the appellants argued in the district court that treaties should be distinguished from congressional-executive agreements based on the concept of "sovereignty." Put another way, accords which "significantly" impinge upon national, state and local sovereignty, as NAFTA purportedly does through the establishment, inter alia, of supranational adjudicatory bodies, must be considered to be treaties requiring Senate ratification. See Tribe, supra, at 1267 ("Whatever the details, the impact of an agreement on state or national sovereignty must ultimately determine whether the agreement constitutes a treaty . . . ."). However, we again find such a distinction unhelpful, inasmuch as it requires courts to delve into areas not normally reserved for judicial expertise. Indeed, in an increasingly interdependent global economy, simple bilateral tariff arrangements, which have historically been approved either as ordinary legislation or delegated to the President's discretion, see, e.g., Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), and are clearly committed by the Constitution to Congress as one of its enumerated powers, U.S. Const. Art. I, § 8, may be said to significantly impinge on national sovereignty. Cf. Tribe, supra, at 1266 (conceding that "line-drawing in this area is especially complex," but arguing that "the difficulty in drawing such a line does not mean that the distinction can be discarded").

32

the procedures employed in its enactment.   Accordingly, the appellants cite the Supreme Court's decisions in United States v. Munoz-Flores, 495 U.S. 385, 395-96, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990), Morrison v. Olson, 487 U.S. 654, 671, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), Chadha, 462 U.S. at 942, 103 S.Ct. 2764, and Powell, 395 U.S. at 548-49, 89 S.Ct. 1944, in support of the contention that there exists no lack of judicially manageable standards where the underlying determination to be made is legal in nature (i.e., concerning the interpretation of a legal text such as the Constitution, even in the absence of clearly defined textual terms).  Thus, in the appellants' view, the lack of a constitutionally-provided definition for the term "treaty" does not deprive this court of judicially manageable standards by which to rule on the merits of this case.

It is true that the Supreme Court has rejected arguments of nonjusticiability with respect to other ambiguous constitutional provisions.  In Munoz-Flores, the Court was confronted with the question of whether a criminal statute requiring courts to impose a monetary "special assessment" on persons convicted of federal misdemeanors was a "bill for raising revenue" according to the Origination Clause of the Constitution, Art. I, § 7, cl. 1, in spite of the lack of guidance on exactly what types of legislation amount to bills "for raising revenue."  The Court, in electing to decide the issue on the merits, rejected the contention that in the

absence of clear guidance in the text of the Constitution, such a determination should be considered a political question.

> To be sure, the courts must develop standards for making [such] determinations, but the Government suggests no reason that developing such standards will be more difficult in this context than in any other. Surely a judicial system capable of determining when punishment is "cruel and unusual," when bail is "[e]xcessive," when searches are "unreasonable," and when congressional action is "necessary and proper" for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges.

495 U.S. at 395-96, 110 S.Ct. 1964.

Similarly, in Morrison v. Olson, despite the fact that "[t]he line between 'inferior' and 'principal' officers [as used in Art. II, § 2, cl. 2 of the Constitution] is one that is far from clear, and the Framers provided little guidance as to where it should be drawn," the Supreme Court found itself capable of defining the boundaries of such terms and, consequently, of interpreting the effect of the provision. Morrison, 487 U.S. at 671. See also Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 880-82, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (holding that a special trial judge in the United States Tax Court is an "inferior officer" whose appointment must conform to the Appointments Clause); Buckley v. Valeo, 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner

34

prescribed by § 2, cl. 2, of [Article II].").

Finally, in <u>Chadha</u>, the Court found justiciable a claim calling for it to interpret the language of the Presentment Clause, which failed to specify exactly which actions required the concurrence of both houses of Congress. <u>Chadha</u>, 462 U.S. at 981, 103 S.Ct. 2764. The Court held that the section of the Immigration and Nationality Act authorizing a one-House veto power over executive department decisions made pursuant to the Act was unconstitutional. According to the Court, such an action was essentially legislative in nature and should, therefore, be subject to the constitutional requirements of bicameral passage by majority vote and presentment to the President. Thus, although the Court recognized Congress's plenary power to legislate in the area of immigration, it held that such power was still subject to limitations included in the text of the Constitution and to judicial review. <u>See also</u> <u>Clinton v. City of New York</u>, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (striking the Line Item Veto Act as unconstitutional for violating the Presentment Clause).

We note that none of these cases, however, took place directly in the context of our nation's foreign policy, and in none of them was the constitutional authority of the President and Congress to manage our external political and economic relations implicated. In addition to the Constitution's textual commitment of such

35

matters to the political branches, we believe, as discussed further below, that in the area of foreign relations, prudential considerations militate even more strongly in favor of judicial noninterference. Furthermore, we believe that in requesting, as the appellants do, that this court adjudicate the "significance" of an international commercial agreement as the critical determinant of whether or not it constitutes a treaty requiring Senate ratification, we would be unavoidably thrust into making policy judgments of the sort unsuited for the judicial branch.

*B.*     *Prudential Considerations*

Finally, under the Goldwater/Baker criteria, we find that a number of prudential factors are relevant to the resolution of this case, including: (1) the necessity of federal uniformity; (2) the potential effect of an adverse judicial decision on the nation's economy and foreign relations; and (3) the respect courts should pay to coordinate branches of the federal government. See Goldwater, 444 U.S. at 998, 100 S.Ct. 533 (Powell, J., concurring); Baker, 369 U.S. at 217, 82 S.Ct. 691.

As the Supreme Court stated in Coleman v. Miller, 307 U.S. 433, 454-55, 59 S.Ct. 972, 83 L.Ed. 1385 (1930), "In determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also

36

the lack of satisfactory criteria for a judicial determination are dominant considerations."  In Baker, the Court recognized the special importance of our nation speaking with one voice in the field of foreign affairs.  Baker, 369 U.S. at 211, 82 S.Ct. 691.  The Court has further observed that "federal uniformity is essential" in the area of foreign commerce, Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), and that "the Federal Government must speak with one voice when regulating commercial relations with foreign governments." Michelin Tire Corp. v. Commissioner, 423 U.S. 276, 285, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).

A judicial declaration invalidating NAFTA at this stage would clearly risk "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Baker, 369 U.S. at 217, 82 S.Ct. 691.  Although the appellants argue that these considerations are irrelevant to an assessment of the constitutionality of the treaty-making procedures, we believe in this case that a challenge to the procedures used to enact NAFTA is inextricably bound to its substantive provisions, inasmuch as a judicial declaration invalidating NAFTA would be aimed at forcing the withdrawal of U.S. participation in the agreement, with serious repurcussions for our nation's external relations with Mexico and Canada.

37

A judicial order contradicting the actions of the President and Congress could also have a profoundly negative effect on this nation's economy and its ability to deal with other foreign powers. Significantly, granting the appellants' requested relief in this case would not only affect the validity of NAFTA, but would potentially undermine every other major international commercial agreement made over the past half-century. See Ackerman and Golove, supra, at 925 n.519 (questioning, in light of the ongoing dispute between the Senate and the President over the meaning of Article 46 of the as-yet-unratified Vienna Convention of the Law of Treaties, that "[i]f the [Supreme] Court were to strike down the modern constitutional practice, what would be the status of all the unconstitutional agreements that have been negotiated over the last half-century?"). In reporting to Congress on the effects of NAFTA in 1997, the President stated that "[c]ooperation between the Administration and the Congress on a bipartisan basis has been critical in our efforts to reduce the deficit, to conclude trade agreements that level the global playing field for America, to secure peace and prosperity along America's borders, and to help prepare all Americans to benefit from expanded economic opportunities." President Clinton, *Study on the Operation and Effect of the North American Free Trade Agreement*, (1997). Furthermore, myriad individual decisions and governmental measures which have been carried out in

reliance on NAFTA; since it took effect on January 1, 1994, the governments, private businesses and citizens of the United States, Mexico and Canada have conducted their affairs in reliance on the lowered tariffs and reduced trade and investment restrictions enshrined in the new regime.  While perhaps not individually arising to the level of "an unusual need for unquestioning adherence to a political decision already made," Baker, 369 U.S. at 217, 82 S.Ct. 691, such considerations further militate in favor of judicial restraint, given that a decision declaring NAFTA unconstitutional would be likely to have a destabilizing effect on governmental relations and economic activity across the North American continent.

Finally, a review by this court of the process by which the President and Congress enter into international agreements would run the risk of intruding upon the respect due coordinate branches of government.  As Justice Powell concluded in his concurrence in Goldwater, "Prudential considerations persuade me that a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority." Goldwater, 444 U.S. at 996, 100 S.Ct. 533 (Powell, J., concurring).  Similarly, Justice Rehnquist's concurrence admonished that "[t]he Judicial Branch should not decide issues affecting the allocation of power between the President and Congress

39

until the political branches reach an impasse." Id. at 1005 n.1, 100 S.Ct. 533. Since no such impasse has been reached with respect to NAFTA, we believe this requires greater deference on the part of the Judiciary to the decisions of coordinate branches of government.[34]  In this regard, we note that no member of the Senate itself has asserted that body's sole prerogative to ratify NAFTA (or, for that matter, other international commercial agreements) by a two-thirds supermajority.  In light of the Senate's apparent acquiescence in the procedures used to approve NAFTA, we believe this further counsels against judicial intervention in the present case.

*IV     Conclusion*

We therefore conclude that this case presents a nonjusticiable political question, thereby depriving the court of Article III jurisdiction in this matter.  Our conclusion is supported by the Tenth Circuit's holding in Dole v. Carter, 569 F.2d 1109 (10th Cir.1977), in which the court invoked the political question doctrine in refusing to decide whether an agreement by the President to return the Hungarian crown jewels to that country constituted a treaty requiring Senate ratification. Dole, 569 F.2d at 1110.  In so holding, the court found that there was "no way for [the

---

[34] Given that three other Justices joined Justice Rehnquist's concurring opinion, it is arguable that when added to Justice Powell's ripeness rationale, a majority of the Goldwater Court agreed with the proposition that the case was nonjusticiable absent an impasse between the political branches.

court to] ascertain[] the interest of the United States . . . in the controversy." Id. The Dole court thus "decline[d] to enter into any controversy relating to distinctions which may be drawn between executive agreements and treaties." Given the Tenth Circuit's express recognition of the inherent difficulty surrounding the distinction between executive agreements and treaties and its refusal to rule on the issue, the Dole decision is directly analogous to the outcome in this case.

In dismissing this case as a political question, we do not mean to suggest that the terms of the Treaty Clause effectively allow the political branches to exercise unfettered discretion in determining whether to subject a particular international agreement to the rigors of that Clause's procedural requirements; to state as much would be tantamount to rendering the terms of Art. II, § 2, cl. 2 a dead letter. Indeed, as the Court stated in Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 (1920), "[i]t is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could." See also Holden v. Joy, 84 U.S. (17 Wall.) 211, 242-43, 21 L.Ed. 523 (1872) ("Express power is given to the President, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the senators present concur, and inasmuch as the power is given, in general terms, without any description of the objects intended to be embraced

within its scope, it must be assumed that the framers of the Constitution intended that it should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects of negotiation and treaty, if not inconsistent with the nature of our government and the relation between the States and the United States."); Weinberger v. Rossi, 456 U.S. 25, 30 n. 7, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) ("Submission of Art. II treaties to the Senate for ratification is . . . required by the Constitution.").  We only conclude that in the context of international commercial agreements such as NAFTA — given the added factor of Congress's constitutionally-enumerated power to regulate commerce with foreign nations, as well as the lack of judicially manageable standards to determine when an agreement is significant enough to qualify as a "treaty" — the issue of what kinds of agreements require Senate ratification pursuant to the Art. II, § 2 procedures presents a nonjusticiable political question.

Accordingly, we DISMISS the appeal and REMAND with instructions to dismiss the action and vacate the decision of the district court.  See Goldwater, 444 U.S. at 1005, 100 S.Ct. 533; United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).