Dennis KUCINICH, Representative to Congress from Ohio, et al., Plaintiffs,

v.

George W. BUSH, President of the United States, Colin Powell, Secretary of State, Donald H. Rumsfeld, Secretary of Defense, Defendants.

No. CIV.A. 02–1137(JDB)ECF.

United States District Court, District of Columbia.

Dec. 30, 2002.

James Klimaski, Klimaski & Grill, P.C., Washington, DC, Peter Weiss, John Burroughs, Lawyers' Committee on Nuclear Policy, New York, NY, Bruce Ackerman, New Haven, CT, Jeremy Manning, New York, NY, Jules Lobel, Michael Ratner, Center for Constitutional Rights, New York, NY, Edward A. Aguilar, Philadelphia Lawyers Alliance for World Security, Philadelphia, PA, Michael Veiluva, Western States Legal Foundation, Oakland, CA, for Plaintiffs.

Carol Federighi, U.S. Dept. of Justice, Civ. Div., Federal Programs Branch, Washington, DC, Shannen Coffin, Dept. of

Justice, Civ. Div., Washington, DC, Joseph Hunt, Vincent Garvey, Dept. of Justice, Civ. Div., Federal Programs Branch, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BATES, District Judge.

Thirty-two members of the House of Representatives (hereinafter "plaintiffs" or "the congressmen") bring this action against President George W. Bush, Secretary of State Colin Powell, and Secretary of Defense Donald H. Rumsfeld ("defendants") challenging President Bush's unilateral withdrawal from the 1972 Anti–Ballistic Missile Treaty ("ABM Treaty") without the approval of Congress. The congressmen contend that because the Supremacy Clause of the Constitution classifies treaties, like Acts of Congress, as the "supreme law of the land," the President cannot terminate a treaty without congressional consent, any more than he could repeal a statute. Defendants counter that the congressmen lack standing to bring this action, that their complaint raises a nonjusticiable political question, and that their claim is not ripe. Defendants further contend that given the President's plenary power over foreign relations under the Constitution and the fact that the treaty authority is in Article II of the Constitution delineating the Executive Branch's powers, and in light of historical practice over the past 200 years, the President's withdrawal from the ABM Treaty without seeking congressional approval was constitutional.

Before the Court are cross-motions for summary judgment, and several amicus briefs. The Court does not reach the merits of plaintiffs' claim in the face of two prongs of the justiciability doctrine, each founded on separation of powers concerns. Under the ruling in *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), the Court finds that these thirty-two congressmen have not alleged the requisite injury to establish standing to pursue their claim. And pursuant to *Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), the Court concludes that the treaty termination issue is a nonjusticiable "political question" that cannot be resolved by the courts. Accordingly, this action will be dismissed.

## BACKGROUND

The United States and the Soviet Union entered into the bilateral ABM Treaty on October 3, 1972.[1] The ABM Treaty strictly limited the number and location of anti-ballistic missile systems that each side could deploy for defense against nuclear missile attacks. Both nations agreed not to develop ABM technology, and not to test or deploy such technology on land, at sea, or in space. A critical component of an interlocking framework of arms control agreements, the ABM Treaty was a cornerstone of the Cold War policy of "mutually assured destruction," an understanding that without ABM defenses neither side would risk starting a nuclear war because it knew the other side would massively retaliate, thus ensuring the widespread destruction of both nations.

President Bush, however, concluded that the world order and international security had drastically changed since the inception of the ABM Treaty three decades ago. Accordingly, on December 13, 2001, he gave Russia the requisite six-months notice of the intention of the United States to

---

1. *See* Limitation of Anti–Ballistic Missile Systems, May 26, 1972, U.S.-U.S.S.R., 23 U.S.T. 3435.

withdraw from the ABM Treaty, pursuant to the Treaty's termination clause:

> Each Party shall, in exercising its national sovereignty, have the right to withdraw from this Treaty if it decides that extraordinary events related to the subject matter of this Treaty have jeopardized its supreme interests. It shall give notice of its decision to the other Party six months prior to withdrawal from the Treaty.

ABM Treaty, art. XV, cl. 2. The White House explained that "[t]he Soviet Union no longer exists [and] Russia is not an enemy, but in fact is increasingly allied with us on a growing number of critically important issues."[2] The State Department cited the development of "a new strategic relationship with Russia that is cooperative rather than adversarial," including "strong relationships with most states of the former Soviet Union." *See* United States Department of State, Text of Diplomatic Notes Sent to Russia, Belarus, Kazakhstan, and Ukraine (Dec. 14, 2002).

President Bush also explained that a number of foreign regimes "have acquired or are actively seeking to acquire weapons of mass destruction . . . [that] pose a direct threat to the territory and security of the United States." *Id.* "The attacks against the U.S. homeland on September 11 vividly demonstrate that the threats we face today are far different from those of the Cold War." Def. Motion, Ex. 2, supra *note 2.* Compliance with the Treaty, President

Bush noted, "hinders our government's ability to develop ways to protect our people from future terrorist or rogue state missile attacks."[3]

Before he withdrew from the Treaty, however, President Bush did not submit the question of treaty termination to the Senate or the House. Nor did the President otherwise seek congressional consent for the withdrawal. Nearly six months after President Bush announced his intention to terminate the treaty, these congressmen brought suit on June 11, 2002, just two days before the termination of the ABM Treaty became effective.[4]

## ANALYSIS

Defendants raise a number of distinct bases for dismissing plaintiffs' complaint on jurisdictional grounds, including standing, political question, and ripeness. These doctrines all arise out of the "bedrock requirement" that courts hear only "cases and controversies." *See ·Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). As the Supreme Court has explained, "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.' " *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).[5] The Court will

---

2. *See* Def. Motion, Ex. 2 (Office of the Press Secretary, the White House, Announcement of Withdrawal From the ABM Treaty, at 1 (Dec. 13, 2001)). Whether the disintegration of the Soviet Union terminated the Treaty's obligations, or the Soviet Union's successor states instead succeeded to or accepted the Treaty's terms, is not at issue here.

3. *See* Def. Motion, Ex. 5 (Office of the Press Secretary, the White House, Remarks by the President on Missile Defense (Dec. 13, 2001)).

4. No emergency relief was, or since has been, requested.

5. Standing must be determined as a threshold jurisdictional matter. *See Whitmore v. Arkan-*

therefore begin its analysis with standing, and then proceed to the related issue of whether a nonjusticiable political question is presented. In light of the resolution of these threshold jurisdictional issues, the Court does not reach the merits of plaintiffs' claims.

## I. *Standing*

Article III of the Constitution restricts the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Allen,* 468 U.S. at 750, 104 S.Ct. 3315. This requirement has given rise to "several doctrines . . . 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Allen,* 468 U.S. at 750, 104 S.Ct. 3315 (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *Valley Forge,* 454 U.S. at 471, 102 S.Ct. 752. One aspect of this "case-or-controversy" requirement is that plaintiffs must have standing to sue, an inquiry that focuses on whether the plaintiff is the proper party to bring suit. *FW/PBS, Inc.,* 493 U.S. at 231, 110 S.Ct. 596. Hence, "'the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Allen,* 468 U.S. at 750–51, 104 S.Ct. 3315 (quoting *Warth,* 422 U.S. at 498, 95 S.Ct. 2197).

Standing focuses on the particular injury allegedly suffered by the plaintiff:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted). "These requirements together constitute the 'irreducible constitutional minimum' of standing, which is an 'essential and unchanging part' of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches." *Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (internal citations omitted) (quoting *Lujan,* 504 U.S. at 559–60, 112 S.Ct. 2130).

## A. *Raines v. Byrd*

The question whether members of Congress have standing to sue Executive Branch officials is neither novel nor unsettled. Indeed, this case is squarely within the holding of *Raines v. Byrd.* The Supreme Court in *Raines* emphasized that in cases of inter-branch disputes between the Executive and Legislative Branches of government, courts must conduct a more exacting scrutiny of standing, particularly

---

sas, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101–02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In *Campbell v. Clinton,* 203 F.3d 19 (D.C.Cir. 2000), a complaint brought by several congressmen against President Clinton was challenged on grounds of mootness, standing, and justiciability. The Court of Appeals, however, only reached standing: "Since we agree with the district court that the congressmen lack standing, it is not necessary to decide whether there are other jurisdictional defects." 203 F.3d at 20.

the alleged injury: "our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." 521 U.S. at 819–20, 117 S.Ct. 2312.

Like the congressmen here, the plaintiffs in *Raines* were a small number of members of Congress suing the Executive Branch. They challenged the constitutionality of the Line Item Veto Act, 2 U.S.C. § 691 *et seq.*, which authorized the President to strike, or "veto," specific items or provisions within appropriations legislation. Although the plaintiffs in *Raines* had voted against the bill, both the Senate and the House passed the legislation by wide margins, and President Clinton signed it into law.

After losing the fight in Congress, the congressmen in *Raines* brought their challenge to court, arguing that the Act "unconstitutionally expand[ed] the President's power" and "violate[d] the requirements of bicameral passage and presentment by granting to the President, acting alone, the authority to 'cancel' and thus repeal provisions of federal law." *Raines*, 521 U.S. at 816, 117 S.Ct. 2312. The Line Item Veto Act, they contended, "divest[ed] the plaintiffs of their constitutional role in the repeal of legislation," and "alter[ed] the constitutional balance of powers between the Legislative and Executive Branches." *Id.* The District Court found that the congressmen's claim that the Act "dilute[d] their Article I voting power" was a sufficient injury to confer standing, and ultimately found that the Act violated the Presentment Clause of the Constitution, amounting to an unconstitutional delegation of legislative power to the President. *See Byrd v. Raines*, 956 F.Supp. 25, 31, 32–38 (D.D.C.1997). On direct review, the Supreme Court vacated the District

Court's ruling, and held that the plaintiffs could not meet "the bedrock requirement" of standing:

'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' ... We have always insisted on strict compliance with this jurisdictional standing requirement.

521 U.S. at 818–19, 117 S.Ct. 2312 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

In order to establish standing, the Supreme Court emphasized, a plaintiff must show that the "claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." 521 U.S. at 820, 117 S.Ct. 2312. The Court underscored that the injury must be *personal* to that plaintiff in order to satisfy the Article III case-or-controversy requirement:

To meet the standing requirements of Article III, "[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (emphasis added). For our purposes, the italicized words in this quotation from *Allen* are the key ones. We have consistently stressed that a plaintiff's complaint must establish that he has a "personal stake" in the alleged dispute, and that the alleged injury suffered is particularized as to him.

*Id.* at 818–19, 117 S.Ct. 2312; *see also Lujan*, 504 U.S. at 561 n. 1, 112 S.Ct. 2130 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.").

The Supreme Court characterized the congressmen's alleged injury in *Raines* as

"the abstract dilution of institutional legislative power." *Id.* at 826, 117 S.Ct. 2312. The congressmen there alleged a broad "type of institutional injury," particularly "the diminution of legislative power"—an injury, the Court found, "which necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821, 117 S.Ct. 2312. The Court held "that these individual members of Congress do not have a sufficient 'personal stake' in the dispute and have not alleged a sufficiently concrete injury to have established Article III standing." *Id.* at 830, 117 S.Ct. 2312.

### B. The Application of *Raines* Here

■ The injuries in *Raines* are precisely the type of injuries raised here. The complaint alleges that plaintiffs have standing because President Bush failed to obtain congressional consent to withdraw from the ABM Treaty, and hence they were "deprived of their constitutional right and duty to participate in treaty termination." Compl. ¶ 13. Plaintiffs allege that the Constitution requires "that the making, modifying, and terminating of treaties be the joint prerogative of the executive and legislative branches," and that in light of the Constitution's checks and balances "the President has a duty to seek and obtain the concurrence of two-thirds of the Senate or a majority of both Houses for the termination of a treaty." Compl. ¶¶ 11–12. As their complaint characterizes it, "plaintiffs have sustained a grievous institutional injury by being deprived of their constitutional right and duty to participate in treaty termination." *Id.* at ¶ 13. This alleged injury mirrors that claimed in *Raines,* where the congressmen argued they were "divest[ed] ... of their constitutional role in the repeal of legislation." 521 U.S. at 816, 117 S.Ct. 2312. It is, effectively, the same *institutional* injury as in *Raines,* where the Line Item Veto Act allegedly "alter[ed]

the constitutional balance of powers between the Legislative and Executive Branches." *Id.*

There are striking similarities between the claims in *Raines* and the claims here. Both groups of congressmen brought their claims in "their official capacities as members of the United States Congress." *Compare* Compl. ¶ 6 *with Raines,* 521 U.S. at 816, 117 S.Ct. 2312. Both allege injuries to the constitutional role and power of the Legislative Branch—here, in the treaty termination process, and in *Raines,* in the repeal of legislation. In both cases, all members of Congress (not just those bringing the lawsuit) suffered the alleged injuries equally. Indeed, the congressmen here conceded at the hearing on the parties' motions that their alleged injuries extend to all members of the House and Senate, just as the injury alleged in *Raines* did. *See* 521 U.S. at 821, 117 S.Ct. 2312 (injury "necessarily damage[d] all Members of Congress and both Houses of Congress equally").

In each case, moreover, the congressmen had actually voted on measures they opposed, but lost the vote. In *Raines,* the congressmen had voted on the legislation establishing the Line Item Veto Act: "[T]heir votes were given full effect. They simply lost that vote." 521 U.S. at 824, 117 S.Ct. 2312. Likewise, here the congressmen voted on a resolution against President Bush's termination of the Treaty, and lost. On June 6, 2002, Representative Kucinich offered a resolution in the House:

Whereas, the President does not have the authority to repeal laws .... Therefore, be it resolved, That the President should respect the Constitutional role of Congress and seek the approval of Congress for the withdrawal of the United States of America from the Anti–Ballistic Missile Treaty.

Compl. ¶ 25. Following debate, the Speaker of the House ruled the resolution did not constitute a point of privilege under House rules and therefore could not be considered at the time. On appeal of that ruling to the full House, a motion to table the appeal was agreed to by a vote of 254 to 169. Compl. ¶ 25. All thirty-two congressmen who are plaintiffs here voted against the motion to table Congressman Kucinich's resolution. *See* H.R. Roll Call Vote No. 214, June 6, 2002.[6] There has been no claim here that their votes were not given full effect. Rather, "[t]hey simply lost that vote." *Raines,* 521 U.S. at 824, 117 S.Ct. 2312.

Simply put, *Raines* teaches that generalized injuries that affect all members of Congress in the same broad and undifferentiated manner are not sufficiently "personal" or "particularized," but rather are *institutional,* and too widely dispersed to confer standing.

> [A]ppellees do not claim that they have been deprived of something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them.*

Rather, appellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete.... [T]he injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress. If one of the Members of Congress were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power.

*Id.* at 821, 117 S.Ct. 2312 (citations omitted; emphasis in original). In short, "the institutional injury they allege is wholly abstract and widely dispersed." *Id.* at 829, 117 S.Ct. 2312. So, too, here the claim that plaintiffs were deprived of a constitutional right and duty to participate in treaty termination is, like the dilution of legislative power alleged in *Raines,* an institutional injury lacking a personal, particularized nature.[7]

**6.** Likewise, Senator Feingold sought a unanimous consent resolution stating that it was "the sense of the Senate that approval of the United States Senate is required to terminate any treaty between the United States and another nation" and that "the Senate does not approve the withdrawal of the United States from the [ABM] Treaty." Compl. ¶ 26. However, an objection was made, and the resolution was never considered by the Senate.

**7.** The Supreme Court upheld legislative standing for institutional injuries in *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). The plaintiffs were twenty Kansas senators who voted against the ratification of a constitutional amendment, resulting in a deadlock that otherwise would defeat the amendment. But the Kansas lieutenant governor, the presiding officer of the state senate, cast the tie-breaking vote to ratify the amendment, thereby "nullifying" the twenty state senators' votes and leaving them with no remedy—an injury the Supreme Court deemed particularized and personal to those state senators. *Raines,* however, distinguished the injury in *Coleman:*

> It is obvious, then, that our holding in *Coleman* stands (at most) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified. It should be equally obvious that [plaintiffs'] claim does not fall within our holding in *Coleman,* as thus understood. They have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated.

*Raines,* 521 U.S. at 823–24, 117 S.Ct. 2312 (citations omitted).

Nor are the congressmen's injuries here the unusual type of personalized injury affecting a specific legislator for which the Supreme Court has recognized standing. In *Raines*, the Court distinguished that rare instance where a legislator would have standing to bring suit, specifically *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), in which a newly elected congressman had standing to bring suit when the House excluded him from his seat because of alleged fraud.

> Unlike the injury claimed by Congressman Adam Clayton Powell, the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress.

*Raines*, 521 U.S. at 821, 117 S.Ct. 2312 (emphasis in original).

Thus, in nearly every respect, plaintiffs' alleged injuries are effectively the same as those raised in *Raines*, involving a similar alleged loss of legislative power to the Executive Branch. Both groups of congressmen asserted purely institutional injuries that were not personal to the individual congressmen. Under *Raines*, then, the plaintiffs here do not have standing.

### C. Decisions Subsequent to *Raines*

This Circuit has applied *Raines* in two subsequent cases, underscoring the principle that absent some discrete, personal, particularized injury, a handful of congressmen will not have standing to bring suit against the Executive Branch. Each case—like this one—involved congressmen suing the President over an alleged diminution of their roles as members of Congress.

In *Chenoweth v. Clinton*, 181 F.3d 112 (D.C.Cir.1999), four congressmen brought suit against President Clinton challenging an environmental program enacted through executive order rather than legislation. The President's use of an executive order, plaintiffs claimed, "deprived [them] of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving interstate commerce and the expenditure of federal money. 181 F.3d at 113. The alleged injury in *Chenoweth* was "predicated upon the theory that . . . the President denied them their proper role in the legislative process and, consequently, diminished their power as Members of Congress." *Id.* Finding *Raines* dispositive, the court concluded that the congressmen did not have standing and dismissed the case:

> As the plaintiffs point out, the injury they allegedly suffered when the President issued [the executive order]—a dilution of their authority as legislators—is . . . identical to the injury the Court in *Raines* deprecated as "widely dispersed" and "abstract." If, as the Court held in *Raines*, a statute that allegedly "divests [congressmen] of their constitutional role" in the legislative process does not give standing to sue, then neither does an Executive Order that allegedly deprives congressmen of their "right[ ] to participate and vote on legislation in a manner defined by the Constitution."

*Id.* at 115 (citations omitted). The court found the plaintiffs' claimed injury—the "dilut[ion of] their authority as members of Congress"—was "indistinguishable from the claim to standing the Supreme Court rejected in *Raines*." *Id.* at 117.

The same result was reached in *Campbell v. Clinton*, 203 F.3d 19 (D.C.Cir.2000). There, thirty-one congressmen challenged President Clinton's use of armed forces in Yugoslavia, claiming that the President "acted illegally—in excess of his authority—because he waged war in the constitutional sense without a congressional delegation," in violation of the War Powers Resolution, thereby "inflict[ing] an institutional injury upon Congress, in this case

by circumventing its legislative authority." 203 F.3d at 21–22. The court found that the congressmen did not have standing under *Raines*. "The [Supreme] Court did not suggest in *Raines* that ... congressmen would have standing anytime a President allegedly acts in excess of statutory authority." *Id.* at 22. Again, the injury alleged was to the institution, not to individual members of Congress.

The injuries alleged in *Chenoweth* and *Campbell*—which the Court of Appeals found were insufficient to establish standing—are much like the injuries claimed here. The congressmen claim that they have been divested of their constitutional role in treaty termination. That is no different from the alleged injury in *Chenoweth*—being divested of a role in voting on and approving or rejecting legislation—or the alleged injury in *Campbell*—being divested of a role in declaring war. Indeed, the injury alleged by plaintiffs here, that President Bush's termination of the ABM Treaty "dilute[d] their Article I voting power," is virtually indistinguishable from the injuries asserted in *Chenoweth* and *Campbell*, which also involved alleged dilution of authority as members of Congress. Plaintiffs do not—and cannot—explain how their alleged injuries are personal to them. Rather, their claim of a "grievous institutional injury" where they are "deprived of their constitutional right ... to participate in treaty termination" is no different from the institutional injuries alleged in Chenoweth, Campbell, and *Raines*.

### D. Political Remedies

The conclusion that plaintiffs do not have standing is reinforced by the fact that, in addition to seeking judicial resolution, they have a number of other, equally effective remedies available to pressure the President to obtain congressional consent to the termination of the ABM Treaty. Plaintiffs assert that "[g]iven the President's mistaken view of his authority to engage in treaty termination on his own, Plaintiffs are completely without any legislative remedy to rectify the President's proposed unlawful termination of the ABM Treaty." Compl. ¶ 14. The Court disagrees. These congressmen have remedies they can use as political leverage to prevent the President's unilateral termination of the ABM Treaty as part of the give-and-take discussion and compromise envisioned by the Framers of the Constitution. Indeed, the availability of legislative countermeasures was a factor in the Supreme Court's decision in *Raines*. *See* 521 U.S. at 829, 117 S.Ct. 2312; *see also id.* at 821, 117 S.Ct. 2312 ("In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process.").

The fact that plaintiffs have several political arrows in their legislative quiver underscores the reluctance of courts needlessly to involve themselves in inter-branch disputes. "Because the parties' dispute is therefore fully susceptible to political resolution, we would ... dismiss the complaint to avoid meddl[ing] in the internal affairs of the legislative branch." *Chenoweth*, 181 F.3d at 116 (citation omitted). "Historically, political disputes between Members of the Legislative and the Executive Branches were resolved without resort to the courts." *Id.* at 113–14.[8] In *Goldwater v.*

---

8. Of course, in *Chenoweth* the court pointed out that Congress could simply overturn President Clinton's American Heritage Rivers Initiative "were a sufficient number in each House so inclined." 181 F.3d at 116. Here, although Congress cannot simply reenact the ABM Treaty as if it were a statute, Congress nonetheless had a number of political options it could follow to persuade the President not

*Carter*, this availability of other remedies to Congress was an important consideration: "[W]e are asked to settle a dispute between coequal branches of our Government, each of which has resources available to protect and assert its interests, resources not available to private litigants outside the judicial forum." 444 U.S. at 1004, 100 S.Ct. 533 (Rehnquist, J., concurring). The plurality opinion then noted:

> Congress has a variety of powerful tools for influencing foreign policy decisions that bear on treaty matters. Under Article I, Section 8 of the Constitution, it can regulate commerce with foreign nations, raise and support armies, and declare war. It has power over the appointment of ambassadors and the funding of embassies and consulates. Congress thus retains a strong influence over the President's conduct in treaty matters. "As our political history demonstrates, treaty creation and termination are complex phenomena rooted in the dynamic relationship between the two branches of our government."

*Id.* at 1005 n. 1, 100 S.Ct. 533 (quoting *Goldwater v. Carter*, 617 F.2d 697, 716 (D.C.Cir.1979) (Wright, J., concurring)). And in *Campbell*, the court also stressed that the congressmen had other remedies:

> [A]ppellants fail because they ... enjoy ample legislative power to have stopped prosecution of the "war." In this case, Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign.... Of course, Congress always retains appropriations authority and could have cut off funds for the American role in the conflict....

And there always remains the possibility of impeachment should a President act in disregard of Congress' authority on these matters.

*Id.* at 23. These political remedies are part of the fabric of *Raines:*

> *Raines* focus[ed] on the political self-help available to congressmen.... [T]he Court denied them standing as congressmen because they possessed political tools with which to remedy their purported injury.... Indeed, *Raines* explicitly rejected [the argument] that legislators should not be required to turn to politics instead of the courts for their remedy.

*Id.* at 24.

Like the congressmen in *Raines, Goldwater,* and *Campbell,* plaintiffs here had extensive "self-help" remedies available to pressure President Bush on terminating the ABM Treaty without Congressional consent. Congressmen can certainly influence a President's actions through the appropriations power by, for example, attempting to deny funding for any ABM system President Bush seeks to build or deploy. *See Campbell,* 203 F.3d at 23. They could even pass legislation, perhaps over President Bush's veto, prohibiting the development or deployment of ABM systems. Congress could also refuse to fund unrelated matters that were important to the President, or even reduce budgets for the Executive Branch; the Senate could reject presidential nominees, or could refuse to provide consent to enter into other treaties submitted by the President; and as a last resort, Congress always has the option of impeachment. *See id.*[9]

---

to withdraw from a treaty without congressional consent.

**9.** The congressmen here argue that they are left with no remedies to encourage or prevent *Russia* from also withdrawing from the Treaty, which they might otherwise have if the

President could not terminate a treaty without congressional approval. Yet Congress does have remedies, however potent, to influence the acts of foreign nations, including the power to impose tariffs on imported goods, to appropriate foreign aid, or to pass legislation

Thus, even without standing to sue, congressional plaintiffs are not otherwise "deprive[d] ... of an adequate remedy" to pressure or force the President to seek congressional consent in terminating a treaty. *See Raines*, 521 U.S. at 829, 117 S.Ct. 2312. In the end, the availability of effective political remedies goes to the very heart of the standing analysis: "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Id.* at 820, 117 S.Ct. 2312 (quoting *Allen*, 468 U.S. at 752, 104 S.Ct. 3315). The requirement of an actual case or controversy is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Allen*, 468 U.S. at 750, 104 S.Ct. 3315. Given the variety of possible political remedies plaintiffs have as congressmen, it is appropriate to defer to the political branches of government, out of respect for the traditional restricted role of the judiciary in disputes between the Legislative and Executive Branches, and in keeping with the Constitution's separation of powers structure. *See generally Walker v. Cheney*, 230 F.Supp.2d 51 (D.D.C.2002).

## E. Plaintiffs' Lack Authority to Bring Suit

Equally importantly, the thirty-two congressmen here have not been authorized, implicitly or explicitly, to bring this lawsuit on behalf of the House, a committee of the House, or Congress as a whole. Indeed, in the year since President Bush announced his intention to withdraw from the ABM Treaty, neither the House nor Congress has made any attempt whatsoever to register disapproval as a body, or to insist on a role in the termination of the Treaty. In *Raines*, the Supreme Court "attach[ed] some importance to the fact that appellees have not been authorized to represent

their respective Houses of Congress in this action." 521 U.S. at 829, 117 S.Ct. 2312. The Supreme Court has observed that individual members of Congress cannot represent the interests of an entire House or all of Congress:

> The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate number of members, but the action of the body as a whole.

*United States v. Ballin*, 144 U.S. 1, 7, 12 S.Ct. 507, 36 L.Ed. 321 (1892); *see also Reed v. County Commissioners*, 277 U.S. 376, 388, 48 S.Ct. 531, 72 L.Ed. 924 (1928) (suit by a committee or subcommittee failed absent specific authority from the House); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("Generally speaking, members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take."); *cf. United States House of Representatives v. United States Dep't of Commerce*, 11 F.Supp.2d 76, 89 (D.D.C.1998) (full House of Representatives specifically authorized to bring suit through statutory provision).

It is entirely logical, from an institutional standpoint, that a group of congressmen bringing suit in court, purportedly to protect Congress's interests, must first have the authority to represent the interests of Congress, the House of Representatives, or the Senate. Permitting individual congressmen to run to federal court any time they are on the losing end of some vote or issue would circumvent and undermine the legislative process, and risk substituting judicial considerations and assessments for legislative ones. In *Goldwater v. Carter*,

concerning (in this instance) the deployment of ABM systems.

Justice Powell pointed out that a "dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority." 444 U.S. at 996, 100 S.Ct. 533 (Powell, J., concurring). Otherwise, Justice Powell warned, individual congressmen might too freely resort to the courts:

> The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse. Otherwise, we would encourage small groups or even individual Members of Congress to seek judicial resolution on issues before the normal political process has the opportunity to resolve the conflict.

*Id.* *Raines* also relies on the availability of alternate remedies, coupled with an absence of voiced Congressional support for the lawsuit, as a reason to find no standing. Here, there is no claim that Congress, as an institution, has asserted its role in the treaty termination process, and there is certainly nothing to suggest that these thirty-two congressmen speak on behalf of Congress as a whole.[10] That context counsels strongly against a conclusion that the exercise of judicial power at this time is warranted as a "last resort, and as a necessity." *Allen,* 468 U.S. at 752, 104 S.Ct. 3315 (citation omitted).

## II. *Justiciability*

Of course, this is not the first time that members of Congress have sued the President because he terminated a treaty without obtaining congressional consent. Prior to *Raines,* twenty-five congressmen sued President Carter in *Goldwater v. Carter,* on the precise grounds asserted by the plaintiffs here, but the Supreme Court dismissed the case as nonjusticiable. Defendants assert that pursuant to *Goldwater,* plaintiffs' claim is likewise not justiciable because the issue involves a congressional challenge to the plenary authority of the President to conduct foreign relations, which is a "political question." This Court agrees that, even if these congressmen somehow had standing to bring this lawsuit, the treaty termination issue is nonetheless a nonjusticiable political question best left for resolution to the political branches of our government.

### A. *Goldwater v. Carter*

*Goldwater* is the only Supreme Court decision to date that addresses the constitutional role of Congress in treaty termination. In 1979, as a precondition for formally recognizing the People's Republic of China, President Carter unilaterally terminated a 25–year–old mutual defense treaty with Taiwan, without obtaining congressional consent. Eight senators, one former senator, and sixteen House members "claim[ed] that the President's action in terminating the treaty with Taiwan has deprived them of their constitutional role with respect to a change in the supreme law of the land." 444 U.S. at 997–98, 100 S.Ct. 533 (Powell, J., concurring). By a 6–3 vote, the Supreme Court remanded to the District Court and ordered the case

---

10. Undoubtably, the thirty-two congressmen cannot represent the interests of the Senate. As members of the House, plaintiffs cannot challenge the President's failure to obtain approval of two-thirds of the Senate before withdrawing from a treaty. Plaintiffs thus cannot raise institutional claims that they were deprived of a right that clearly belongs to the Senate, not to the House of Representatives. *See, e.g., United States v. Munoz–Flores,* 495 U.S. 385, 394–395, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990) (noting that the Constitution "giv[es] the Senate 'Advice and Consent' power over treaties"); *Edye v. Robertson,* 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884).

dismissed, without addressing the merits of the claim.

The Court's ruling resulted in four opinions, two concurring in the judgment and two dissenting. Four Justices in the majority—Justices Rehnquist, Stevens and Stewart, and Chief Justice Burger—concluded that the case should be dismissed because the issue presented a nonjusticiable political question that was inappropriate for resolution by the courts. Justice Powell concurred, finding that the issue was "not ripe for judicial review" because neither Congress nor the President had asserted their constitutional authority to the point of political impasse. Justice Marshall simply concurred in the result.

Three Justices dissented from the Court's order to remand for dismissal. Without reaching the merits, Justices Blackmun and White stated only that the case should be set for oral argument and considered fully. Justice Brennan disagreed that the issue was nonjusticiable and concluded that the President had a constitutional right to withdraw from the treaty, without congressional consent, given "the President's well-established authority to recognize, and withdraw recognition from, foreign governments." *Id.* at 1006, 100 S.Ct. 533 (Brennan, J., dissenting).

None of the opinions in *Goldwater* obtained a majority of votes, and hence no single rationale controls. To be sure, six Justices voted for dismissal on jurisdictional grounds, but only four expressly agreed that the issue was a nonjusticiable political question. As a result, there is no obviously binding holding in *Goldwater*.

■ "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds.'" *Marks v.*

*United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (opinion of Stewart, Powell, and Stevens, JJ.)). However, the rule in *Marks* only applies when the concurrence is implicitly in agreement with the view of a majority of justices:

> We have previously held that the rule of *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), under which the opinion of the Justices concurring in the judgment on the "narrowest grounds" is to be regarded as the Court's holding, does not apply unless the narrowest opinion represents a "common denominator of the Court's reasoning" and "embod[ies] a position implicitly approved by at least five Justices who support the judgment."

*Ass'n of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1254 (D.C.Cir.1998) (quoting *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991)); *see also Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 170 (3rd Cir.1999) ("in cases where the approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court"). Thus, the Supreme Court's ruling in *Marks* "is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions." *King,* 950 F.2d at 781.

That is not the case in *Goldwater*. The plurality's conclusion that the termination of treaties is a nonjusticiable political question did not garner a majority. Justice Powell's concurring opinion, moreover, did not "implicitly approve" of Justice Rehnquist's plurality rationale, and in fact explicitly disagreed with it: "Mr. Rehnquist suggests, however, that the issue presented by this case is a nonjusticiable political question which can never be considered by

this Court. I cannot agree." 444 U.S. at 998, 100 S.Ct. 533 (Powell, J., concurring).

> The specter of the Federal Government brought to a halt because of the mutual intransigence of the President and Congress would require this Court to provide a resolution pursuant to our duty "to say what the law is." *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

*Id.* at 1001, 100 S.Ct. 533. Moreover, Justice Marshall merely concurred in the result, without joining any rationale. It cannot fairly be said, moreover, that ripeness (Justice Powell's rationale) is a "logical subset" of political question (the plurality's rationale)—although perhaps narrower because it deals only with timing. Both are prongs of the case-or-controversy requirement under Article III, but they are independent justiciability doctrines.

Nonetheless, Justice Rehnquist's plurality opinion in *Goldwater* is instructive and compelling. *See Made in the USA Foundation v. United States,* 242 F.3d 1300, 1305 (11th Cir.2001) (finding plurality opinion in *Goldwater* "instructive, if not controlling"). The plurality concluded that the claim that President Carter was constitutionally required to obtain congressional consent before terminating a treaty could not be resolved by the courts:

> [T]he basic question presented by the petitioners in this case is "political" and therefore nonjusticiable because it involves the authority of the President in the conduct of our country's foreign relations and the extent to which the Senate or the Congress is authorized to negate the action of the President. . . . [T]he controversy in the instant case is a nonjusticiable political dispute that should be left for resolution by the Executive and Legislative Branches of the Government.

444 U.S. at 1002–03, 100 S.Ct. 533 (Rehnquist, J., concurring).

In finding the claim nonjusticiable, Justice Rehnquist emphasized the lack of any textual provision providing either branch with authority for treaty termination. He reasoned that because the Constitution spoke only to the procedure for *making* a treaty, but not to a treaty's termination, "the situation presented here is closely akin to that presented in *Coleman,* where the Constitution spoke only to the procedure for ratification of an amendment, not its rejection." *Id.* at 1005, 100 S.Ct. 533; *see also Coleman,* 307 U.S. at 450, 59 S.Ct. 972.

> Here, while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to that body's participation in the abrogation of a treaty. . . . In light of the absence of any constitutional provision governing the termination of a treaty, and the fact that different termination procedures may be appropriate for different treaties, the instant case in my view also "must surely be controlled by political standards."

444 U.S. at 1003, 100 S.Ct. 533 (citation omitted). While Justice Powell agreed that the issue was not justiciable, he concluded that the reason was a lack of ripeness:

> Prudential considerations persuade me that a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority. . . . If the Congress chooses not to confront the President, it is not our task to do so.

*Id.,* at 996–98, 100 S.Ct. 533.

### B. Political Question

■ Like standing, the "political question" doctrine stems from the case-or-con-

troversy requirement in Article III, is "primarily a function of the separation of powers," and operates as a prudential limitation on the propriety of federal courts reviewing the decisions of the other branches of government. *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker,* the Supreme Court held that courts should analyze six criteria to determine whether a case presents a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. 691. In fact, "any one of [these] characteristics may be sufficient to preclude judicial review" under the political question doctrine. *Made in the USA Foundation,* 242 F.3d at 1312. Several of these factors are present here.

■ To be sure, "while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to that body's participation in the abrogation of a treaty." *Goldwater,* 444 U.S. at 1003, 100 S.Ct. 533 (Rehnquist, J., concurring); *see also Made in the USA Foundation,* 242 F.3d at 1315 (the Constitution "fails to outline the Senate's role in the abrogation of treaties").

There is thus no textual commitment of the authority over treaty termination to any branch of the government. The Constitution, however, clearly relegates authority over foreign affairs to the Executive and Legislative Branches, with no role for the Judicial Branch to second-guess or reconsider foreign policy decisions. "[M]atters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952)).

> [T]he very nature of executive decisions as to foreign policy is political, not judicial.... They are decisions of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility and have long been held to belong to the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & Southern Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *see also Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 386, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) ("the nuances of the foreign policy of the United States ... are much more the province of the Executive Branch and Congress than of this Court") (citation omitted).

At the same time, it would be "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 369 U.S. at 211, 82 S.Ct. 691. But on the very issue before this Court—whether the Constitution provides a congressional role in treaty termination—four Justices in *Goldwater* concluded that the issue was a nonjusticiable political question "because it involve[d] the authority of the President in the con-

duct of our country's foreign relations and the extent to which the Senate or the Congress is authorized to negate the action of the President." 444 U.S. at 1002, 100 S.Ct. 533. Moreover, the plurality's conclusion that the issue was political in nature was "even more compelling ... because it involves foreign relations—specifically a treaty commitment to use military force in the defense of a foreign government if attacked." *Id.* at 1003–04, 100 S.Ct. 533. So, too, here the treaty termination issue lies squarely in the arena of foreign relations and involves national defense considerations in that foreign affairs setting.

The circumstances here present "an unusual need for unquestioning adherence to a political decision already made." *Baker,* 369 U.S. at 217, 82 S.Ct. 691. President Bush publicly announced his intention to withdraw from the ABM Treaty on December 13, 2001, providing Russia with the six-months notice required by the Treaty. These thirty-two congressmen, however, waited until two days before that termination became effective to bring this lawsuit. Meanwhile, long aware of the intention of the United States to withdraw from the ABM Treaty, Russia may have acted based upon the President's notice of termination. Foreign governments must be able to rely upon the pronouncements of the United States regarding its treaties.

Hence, were this Court to find the President acted unconstitutionally, and over-turn his decision to terminate the ABM Treaty more than a year after he announced the decision, "the potential[ ] of embarrassment from multifarious pronouncements by various departments on one question" would be undeniable. *Baker,* 369 U.S. at 217, 82 S.Ct. 691; *see also Made in the USA Foundation,* 242 F.3d at 1305. "In determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments ... [is a] dominant consideration." *Coleman,* 307 U.S. at 454–55, 59 S.Ct. 972. With treaties, in particular, a single voice is needed:

It is not surprising, then, that many questions arising in connection with our treaties with other governments have been held to be nonjusticiable. For "[n]ot only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views."

*Holmes v. Laird,* 459 F.2d 1211, 1215 (D.C.Cir.1972) (quoting *Baker,* 369 U.S. at 211, 82 S.Ct. 691).

Courts have therefore repeatedly held that issues concerning treaties are largely political questions best left to the political branches of the government, not the courts, for resolution.[11] Since *Goldwater,*

---

11. *See, e.g., Clark v. Allen,* 331 U.S. 503, 514, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947) ("[T]he question whether a state is in a position to perform its treaty obligations is essentially a political one."); *Terlinden v. Ames,* 184 U.S. 270, 288, 22 S.Ct. 484, 46 L.Ed. 534 (1902) ("[W]hether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and the courts ought not to interfere with the conclusions of the political department in that re-

gard."); *Doe v. Braden,* 57 U.S. (16 How.) 635, 657, 14 L.Ed. 1090 (1853) (questions regarding whether the King of Spain had authority to ratify a treaty with the United States "are political questions, not judicial. They belong exclusively to the political department of the government."); *Made in the USA Foundation,* 242 F.3d at 1305 (whether NAFTA agreement amounted to a "treaty" requiring Senate ratification is a political question); *Earth Island Institute v. Christo-*

one other court has held that the role of Congress in the termination of a treaty presents a nonjusticiable political question. In *Beacon Products Corp. v. Reagan,* 633 F.Supp. 1191, 1198–99 (D.Mass.1986), *aff'd on other grounds,* 814 F.2d 1 (1st Cir. 1987), the court relied on the plurality opinion in *Goldwater* to hold that a constitutional challenge to President Reagan's unilateral termination of the Treaty of Friendship, Commerce, and Navigation with Nicaragua, without congressional consent, raised a political question. The court concluded that in *Goldwater* "the challenge to the President's power vis-a-vis treaty termination raised a nonjusticiable political question. That holding is equally applicable here." 633 F.Supp. at 1199.

Lastly, this Court is further convinced that the issue presented here is nonjusticiable because "undertaking independent resolution" of the issue would result in a failure to accord the "respect due coordinate branches of government." *Baker,* 369 U.S. at 217, 82 S.Ct. 691. Justice Powell concluded in *Goldwater* that the treaty termination issue was not ripe because the political branches had not reached a "constitutional impasse." Likewise, this Court should not rule on the claim of thirty-two

congressmen that President Bush ignored the constitutional role of Congress in the treaty termination process, when Congress itself has not even asserted that it has been deprived of any constitutional right. As Justice Powell stated, courts should refrain from resolving disputes raised by only a small number of congressmen:

> Prudential considerations persuade me that a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority.

444 U.S. at 996, 100 S.Ct. 533. In resolving an issue that neither the House nor the Senate has yet deemed worth asserting, this Court would preempt what is clearly the prerogative of Congress, and could not do so "without expressing lack of the respect due coordinate branches of government." *Baker,* 369 U.S. at 217, 82 S.Ct. 691. Indeed, such judicial action might simply encourage congressmen to run to court any time they disagreed with Presidential action (on a treaty or other foreign relations issue) or were on the losing end of a piece of legislation. *See* 444 U.S. at 997, 100 S.Ct. 533 (Powell, J., concurring).[12] That would undermine both the

---

*pher,* 6 F.3d 648, 653 (9th Cir.1993) (challenge to statute that ordered "Executive to negotiate and enter into treaties with foreign nations . . . is not one that is justiciable in any federal court"); *New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc.,* 954 F.2d 847, 852 (2d Cir.1992) ("the judiciary should refrain from determining whether a treaty has lapsed, and instead should defer to the wishes of the elected branches of government"); *Gayda v. LOT Polish Airlines,* 702 F.2d 424, 425 (2nd Cir.1983) ("abrogation or modification of a treaty by superseding legislation presents political questions with which courts may not involve themselves"); *United States v. Decker,* 600 F.2d 733, 737 (9th Cir.1979) ("The principal area of nonjusticiability concerns the right of the executive to abrogate a treaty."); *Dole v. Carter,* 569 F.2d 1109, 1110 (10th Cir.1977) ("The controversy here is

whether the understanding between the United States and Hungary is a treaty or an executive agreement not requiring Senate action. . . . [T]he dispute, having its origin in the field of foreign relations, presents a nonjusticiable political question.").

**12.** Justice Powell concluded that application of the *Baker v. Carr* factors in *Goldwater* did not establish that the treaty termination issue—if ripe—was always a political question. *See* 444 U.S. at 998–1001, 100 S.Ct. 533. However, in this specific case, this Court concludes that those factors support the conclusion, as discussed above, that a nonjusticiable political question is presented, although it is also true that under Justice Powell's analysis the case is not ripe for judicial resolution.

delicate balance of powers under the Constitution and the limitation of judicial authority to the resolution of justiciable cases or controversies.

## CONCLUSION

The Court concludes that because plaintiffs have alleged only an institutional injury to Congress, not injuries that are personal and particularized to themselves, under *Raines v. Byrd* they do not have standing to bring this lawsuit. The Court also concludes that under *Goldwater v. Carter* the issue raised by these congressmen is a nonjusticiable political question. Therefore, defendants' motion to dismiss or, in the alternative, for summary judgment is granted, and plaintiffs' motion for summary judgment is denied. Plaintiffs' complaint is therefore dismissed.

A separate order has been issued on this date.

## ORDER

Upon consideration of plaintiffs' motion for summary judgment and defendants' motion to dismiss or, in the alternative, for summary judgment, and the entire record herein, and for the reasons stated in the Memorandum Opinion issued on this date, it is by the Court this 30th day of December, 2002, hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that defendants' motion is GRANTED and this action is dismissed in its entirety.